UNITED STATES of America, Appellee,

v.

Frank W. SNEPP, III, Appellant.

The Authors League of America, Inc., Amicus Curiae.

No. 78–1651.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 15, 1978.

Decided March 20, 1979.

Mark H. Lynch, Washington, D. C. (John H. F. Shattuck, American Civil Liberties Union Foundation, Washington, D. C., Stephen Bricker, American Civil Liberties Union of Virginia, Richmond, Va., John Cary Sims, Washington, D. C., Alan Dershowitz, Cambridge, Mass., Geoffrey J. Vitt, Alexandria, Va., on brief), for appellant.

Robert E. Kopp, App. Litigation Counsel, Dept. of Justice, Washington, D. C. (Anthony A. Lapham, Gen. Counsel, Ernest Mayerfeld, Associate Gen. Counsel, Christian F. Winkle, IV, Atty., Central Intelligence Agency, Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., William B. Cummings, U. S. Atty., Alexandria, Va., Thomas S. Martin, Deputy Asst. Atty. Gen., David J. Anderson, Director, Elizabeth Gere Whitaker, Asst. Director, Thomas G. Wilson and Brook Hedge, Attys., Civ. Div., Dept. of Justice, Washington, D. C., on brief), for appellee.

Irwin Karp, New York City, on brief, for amicus curiae The Authors League of America, Inc.

Jack C. Landau, Gordon F. Barrington, Jeffrey Tobias, Law Student Researcher, National Law Center, George Washington University, and Jack Gillman, Law Student Researcher, Stanford University Law School, on brief, for amicus curiae The Reporters Committee for Freedom of the Press.

Henry R. Kaufman, Ira M. Millstein, R. Bruce Rich, Weil, Gotshal & Manges, New York City, on brief, for amici curiae Association of American Publishers, Inc.

Before WINTER and PHILLIPS, Circuit Judges, and HOFFMAN,* Senior District Judge.

WINTER, Circuit Judge:

The United States sued a former employee of the Central Intelligence Agency (CIA) alleging that defendant breached a secrecy agreement with the CIA by publishing a book about the activities of the CIA in South Vietnam and elsewhere without the prior permission and approval of the CIA. The CIA does not assert, however, that the book disclosed classified information or information that defendant had no right to publish. Although defendant prayed a jury trial, the district court heard the case without a jury and granted judgment for plaintiff, ruling that there were no factual issues to be tried by a jury, that the defendant was in breach of his agreement, that he should be enjoined from further publications except in strict compliance with his undertaking to submit proposed publications to the CIA for its prior approval, and that, for breach of his fiduciary obligation not to publish without CIA approval, a constructive trust for the benefit of the government should be imposed on all of the monies which defendant had earned and will earn from publication of his book. Defendant appeals, asserting numerous errors in the trial proceedings and the district court's judgment.

We conclude that defendant was under a valid contractual obligation to submit proposed publications to the CIA for its prior approval, that he breached this agreement, and that the entry of an injunction against further breaches was fully justified and not an abuse of discretion. But we think that it was not shown on this record that defendant breached a fiduciary obligation, and it was therefore improper for the district court to impose a constructive trust on the monies earned from publication of the book. We think that the government is entitled at least to nominal damages for breach of contract and it may be entitled to compensatory and punitive damages also. But if compensatory and punitive damages are sought to be recovered, the issues relating thereto must be submitted to a jury. We therefore affirm in part and reverse in part, remanding the case for further proceedings.

I.

Defendant was first employed by the CIA on September 16, 1968. At the time that he

---

* Walter E. Hoffman, Senior District Judge, United States District Court for the Eastern District of Virginia, sitting by designation.

**930**

was employed he executed a secrecy agreement, the pertinent provisions of which are set forth in the margin, in which he undertook "not to publish . . . any information or material relating to the Agency . . . either during or after the term of my employment . . . without specific prior approval by the Agency."[1] In due course, he was assigned to two tours of duty in Vietnam where he served for four and one-half years. His service in Vietnam included the time that the United States withdrew from participation in the war and the CIA and the military liquidated their operations in that locale. By reason of his employment, defendant was granted frequent access to classified information, including information regarding intelligence sources and methods.

Defendant expressed dissatisfaction with the manner in which the CIA had conducted its affairs in Vietnam and the manner in which it withdrew, and he concluded to write a book on the subject. Defendant claims that he was motivated primarily by altruism and the desire to have the world and the American public know the truth as to what happened, but the government claims that his motive was one primarily of money. In any event, before resigning from the CIA, effective January 26, 1976, defendant negotiated an arrangement with a publisher whose identity he was assiduous

in concealing, and he obtained a publication advance. Thereafter, he resigned from the CIA, and in connection with that resignation he executed the so-called "Termination Secrecy Agreement," the pertinent provisions of which are set forth in the margin, in which he agreed not to "publish . . any classified information, or any information concerning intelligence or CIA that has not been made public by CIA . . . without the express written consent of the Director of Central Intelligence or his representative."[2] Defendant was told that his responsibilities under this agreement were the same as those under the agreement that he signed when he was employed.

Although defendant did not conceal from his CIA colleagues and former CIA colleagues the fact that he was writing a book, he represented on a number of occasions that he intended to submit the manuscript to the CIA for prior approval before submitting it to his publisher. But this he failed to do, so he claims, because the CIA failed to act favorably, in accordance with its established procedures, on his several demands that it conduct a study and prepare a report concerning the deficiencies in its withdrawal from Vietnam. Apparently the CIA gave thought to the possibility of seeking an injunction against defendant to restrain him from publication of his book prior to submission of his manuscript to the

1. Secrecy Agreement

1. I, Frank W. Snepp, III, understand that upon entering on duty with the Central Intelligence Agency I am undertaking a position of trust in that Agency of the Government responsible to the President and the National Security Council for intelligence relating to the security of the United States of America. I understand that in the course of my employment I will acquire information about the Agency and its activities and about intelligence acquired or produced by the Agency.

. . . . .

8. Inasmuch as employment by the Government is a privilege not a right, in consideration of my employment by CIA I undertake not to publish or participate in the publication of any information or material relating to the Agency, its activities or intelligence activities generally, either during or after the term of my employment by the Agency without specific prior approval by the Agency. I understand that it is

established Agency policy to refuse approval to publication of or participation in publication of any such information or material.

2. Termination Secrecy Agreement

1. I, Frank W. Snepp, III, am about to terminate my association with the Central Intelligence Agency. I realize that, by virtue of my duties with that agency, I have been the recipient of information and intelligence that concern the present and future security of the United States of America.

. . . . .

3. I will never divulge, publish, or reveal by writing, word, conduct, or otherwise any classified information, or any information concerning intelligence or CIA that has not been made public by CIA, to any unauthorized person including, but not limited to, any future governmental or private employer or official without the express written consent of the Director of Central Intelligence or his representative.

CIA for its approval and the matter was considered by the Department of Justice. There was evidence that the CIA did not press the Department of Justice to take such action because it relied upon defendant's representations that he intended to honor his contracts.

In any event, defendant's book entitled *Decent Interval* was published in November 1977. It is a highly critical account of the United States' withdrawal from Vietnam at the close of the war and it also contains allegations that the CIA's intelligence reporting from Vietnam was fabricated and distorted, that the CIA manipulated press reporting from Vietnam by providing false information to reporters, that CIA officials in Vietnam engaged in corrupt practices, and that the CIA mishandled the evacuation from Vietnam by failing to evacuate its indigenous agents and employees.

The government sued on February 15, 1978, alleging that plaintiff had breached his contractual and fiduciary obligations to the CIA by failing to submit the manuscript of his book to the CIA for prepublication review pursuant to the original secrecy agreement. It sought a declaration that defendant had breached his contractual and fiduciary duties, damages for breach of contract, an injunction against further breaches, and an accounting and the imposition of a constructive trust over all past and future revenues from the sale of the book. Defendant, in answering, prayed a jury trial. There was extensive pretrial discovery during which the government responded to an interrogatory asserting that it did not contend that *Decent Interval* contains classified information or any information concerning intelligence or CIA that has not been made public by CIA. When the case came on for trial, the district court ruled that there were no factual issues on the merits for the jury to determine.

On the merits, the district court ruled that defendant had breached his contractual and fiduciary duty to submit his manuscript for prepublication review. Finding that the defendant's breach caused the government irreparable harm, the district court enjoined defendant from future violations and imposed a constructive trust on all revenues derived from *Decent Interval* for the benefit of the government. In so doing, it rejected, *inter alia,* defendant's defenses based upon the first amendment and his claim of illegal selective enforcement. These defenses and the facts which relate to them will be discussed more fully hereafter.

## II.

We consider first defendant's contentions relating to his rights under the first amendment and to his contractual obligations. Defendant argues that the 1968 secrecy agreement is in violation of the first amendment and that, to the extent that it applies to classified data, the CIA lacked congressional or presidential authority to require its execution. Defendant also argues that he had no contractual obligation to submit his manuscript for prepublication review. This argument is based upon his assertion that the 1976 termination secrecy agreement superseded the 1968 secrecy agreement, executed when he was first employed, that the 1976 agreement only requires permission for publication of information that is classified or that has not been made public by CIA, while the latter requires prepublication submission of "all" material, and that the CIA has not claimed that defendant published anything required to be submitted under the 1976 agreement.

We see no merit in these arguments. In asserting them, we think that defendant has failed to appreciate our decisions in *United States v. Marchetti,* 466 F.2d 1309 (4 Cir.), *cert. denied,* 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972) (*Marchetti I*); and *Alfred A. Knopf, Inc. v. Colby,* 509 F.2d 1362 (4 Cir.), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 482 (1975) (*Marchetti II*); as well as the language in the agreements that he executed.

In *Marchetti I* and *Marchetti II,* we sustained the validity of secrecy agreements, such as those at issue here, prohibiting CIA employees from publishing classified information from attack under the first

amendment. More importantly, we sustained the constitutional validity of a prepublication review process for all intelligence-related materials for the sole purpose of permitting the CIA to identify and to withhold permission for the disclosure of classified information. Of course we recognized the first amendment right of an employee or former employee "to speak and write about the CIA and its operations, and to criticize it as any other citizen may," 466 F.2d at 1317, but we held that he had no first amendment right to "disclose classified information obtained by him during the course of his employment which is not already in the public domain." *Id.* Consistent with the first amendment, we recognized an obligation on the part of the CIA to respond promptly to a request for authority to publish, and we held that there was a right of judicial review if permission was withheld.

█ In *Marchetti I* and *Marchetti II,* we also noted that the National Security Act of 1947 charges the Director of Central Intelligence with the responsibility for "protecting intelligence sources and methods from unauthorized disclosure," 50 U.S.C. § 403(d)(3), and that secrecy agreements are "entirely appropriate to a program in implementation of the congressional direction of secrecy." 466 F.2d at 1316. Thus, defendant's contention that the CIA lacked congressional authority to execute such agreements is without merit.

█ We think it largely academic whether the 1976 agreement supersedes the 1968 agreement or not.[3] Under the 1968 agreement, defendant agreed "not to publish . . . *any* information or material relating to the Agency, its activities or intelligence activities generally . . . without specific prior approval by the Agency." (Emphasis added.) Of course, under *Marchetti I* and *Marchetti II,* this obligation was enforceable only to the extent that it required defendant to submit *all* information or material relating to the CIA,

its activities and intelligence, so as to permit the CIA to determine what was classified and unpublishable as distinguished from what was unclassified and publishable, and not to publish classified information not already in the public domain.

█ The language of the 1976 agreement is indistinguishable in its effect. It placed on defendant the obligation not to "publish . . . any classified information, or any information concerning intelligence or CIA that has not been made public by CIA . . . without the express written consent of [CIA]." The obligation was to refrain from publishing *any* material concerning intelligence or the CIA without prior submission and prior approval of *all* material, but manifestly the first amendment would not permit the CIA to withhold consent to publication except with respect to classified information not in the public domain. Thus, the meaning and effect of the two agreements are identical.

We decline defendant's invitation to reexamine the correctness of *Marchetti I* and *Marchetti II* ; and in reliance on them we therefore conclude that the secrecy agreements that bound defendant did not violate his first amendment rights and that each validly required him to submit to prepublication review *all* of the material he intended to publish relating in any manner to the CIA.

## III.

There can be no doubt on the record before us that defendant breached his secrecy agreements. Before we turn to the rights of the government with respect to relief, we must consider some of defendant's other defenses to the breach.

### A.

Defendant contends that the district court improperly declined to consider his defense of selective enforcement. Specifically, defendant argues that he is the first

3. In *Marchetti I,* 466 F.2d at 1317 n.6, we noted that an agreement like the 1976 agreement in the instant case lacked consideration and was

for that reason unenforceable. If invalid, the 1976 agreement could not supersede the 1968 agreement.

CIA employee who has been sued for breach of an agreement to submit to prepublication review when, in fact, he published only materials that, although critical of the CIA, are not claimed to be classified, yet other CIA officials and officials in other branches of the government have published books and articles without prepublication review with impunity. In an answer to an interrogatory, the government admitted that two books about the CIA were published by former employees without prepublication review as required by a secrecy agreement and no action was taken to prevent the violation. Other evidence suggested that a number of articles were probably published under similar circumstances.

We see no merit in the defense of selective enforcement, and we think that the district court correctly rejected it. In the first place, defendant's contention of selective enforcement appears to be premised upon the fact that his book is critical of the CIA. To establish improper discrimination in enforcement proceedings, it would be necessary to show that uncritical books were treated differently from critical books with respect to enforcement of the obligation for prepublication review. The proofs that defendant tendered fall short of that objective since they do not identify the nature of the publications with regard to which the secrecy agreement was not enforced, and hence selective enforcement depending upon the critical or noncritical content is not established.

Aside from the factual inadequacies of defendant's claimed defense, there is a basic legal reason why the defense is unavailable. Defendant has cited, and we have found, no authority suggesting that the defense of selective enforcement, normally applied in criminal cases, should be extended to civil actions. Moreover, defendant voluntarily agreed to be bound by the contractual provision requiring prepublication review and he can have little complaint about its being enforced. *United States v. Crowthers,* 456 F.2d 1074 (4 Cir. 1972), on which defendant heavily relies, is inapposite because it was a criminal case—a prosecution for alleged violation of regulations prohibiting disturbances and limiting the distribution of handbills on government property.

### B.

At trial, defendant also raised the defenses of material breach by the CIA, a prior inconsistent oral agreement and fraud. On appeal, he asserts that with respect to all of them it was error to deny him a jury trial on the factual issues which these defenses present. Because we decide that the government was entitled to judgment as a matter of law on these defenses, no jury consideration was required.[4]

Defendant contends that the prepublication review provisions of the 1968 secrecy agreement are unenforceable because the government breached another material provision of that contract. Defendant argues that Paragraph 6 of the 1968 secrecy agreement, the text of which is set forth below,[5] gave him a right to a hearing on his grievance that the CIA mishandled the evacuation of its indigenous agents when it withdrew from Vietnam. He testified that he was denied a hearing, although he conceded that he discussed his views with his superiors and that the Inspector General sent for him to discuss his complaint but took no action thereon. This, he claims, was a material breach on the part of the government, rendering his obligation under the contract unenforceable.

---

4. With exception of the issue of damages, *see* p. 935, *infra,* we agree with the district court that the case presents no issue of fact for the jury to resolve.

5. 6. I understand that for all grievances and complaints there are established procedures within the Agency permitting appeal by any employee of the Agency and to carry any such grievance or complaint outside the Agency will be considered a violation of the undertaking set forth above in paragraph 3 [obligation not to divulge classified information outside of the CIA except as authorized]. If the appeal procedures are inadequate in any situation, I am aware that the Inspector General is at all times available to any employee with a legitimate criticism, grievance, or complaint.

■ First, we do not think that paragraph 6 of the 1968 agreement can be read to guarantee to the defendant a hearing for his grievances. The evident purpose of the paragraph is to prohibit the taking of internal grievances and complaints outside of the CIA. The CIA does not guarantee in that paragraph to provide any specific grievance procedure, and certainly there was no promise of a hearing. At most, the paragraph provides that the Inspector General will be available to consider employee complaints but not that he will make any specific response. Defendant's own testimony establishes that, at the instance of the Inspector General and not that of defendant, the Inspector General did consider his complaint. Certainly defendant can claim no breach of the paragraph because the complaint was not resolved favorably to defendant.

■ Second, even if the CIA could be viewed as having violated Paragraph 6, we deem it an independent clause of the overall agreement, the breach of which would not excuse defendant from his obligation to submit books for prepublication review. When defendant signed the secrecy agreement, his primary purpose and the primary consideration he received were not a promise of a grievance procedure, but rather employment by the CIA in a position involving access to national security secrets. "The breach of an independent provision in a contract which is incidental to its main purpose and which does not go to the whole consideration, does not justify the cancellation of a contract"; cancellation is warranted only if the failure is "a total one, resulting in the defeat of the object of the contract, or rendering that object unattainable." *Arrow Petroleum Co. v. Johnston*, 162 F.2d 269, 276 (7 Cir.), *cert. denied*, 332 U.S. 817, 68 S.Ct. 158, 92 L.Ed. 394 (1947). *See also LeRoy Dyal Co. v. Allen*, 161 F.2d 152, 155 (4 Cir. 1947).

■ Defendant's other defenses to enforcement of the contract require little discussion. We do not think that the plain and unambiguous language of the 1968 secrecy agreement requiring the submission of *all* material relating to the CIA intended to be published can be abrogated by proof of an oral statement by a CIA induction officer that defendant would have the discretion to determine what information was classified and thus what was required to be submitted for review. *See Rock-Ola Manufacturing Corp. v. Wertz*, 282 F.2d 208, 210 (4 Cir. 1960); *see also Ross Engineering Co. v. Pace*, 153 F.2d 35, 42–43 (4 Cir. 1946); *G. L. Webster Co. v. Trinidad Bean & Elevator Co.*, 92 F.2d 177, 178–79 (4 Cir. 1937).

■ In the district court, defendant did not plead fraud as a defense in compliance with F.R.Civ.P. 8(c) and 9(b), and hence his argument that the statement of the CIA induction officer constituted fraud and vitiated defendant's obligation to submit material for prepublication review comes too late. In any event, the proof was insufficient to establish fraud. It did not show that the induction officer had knowledge of the falsity of his statement or that defendant acted in reliance on the statement. *See Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623 (4 Cir.), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977).

Overall, we perceive no valid defense to defendant's breach of contract.

### IV.

#### A.

■ As one item of relief, the district court enjoined defendant from further breaching the terms and conditions of the 1968 secrecy agreement by failing to submit any manuscript or other writing containing information about the CIA to the CIA for review prior to publication on condition that the CIA complete its review within thirty days after submission and that it withhold approval for publication of only materials which are classified. We think that this relief was appropriate and we affirm the district court in this respect.

■ As we have shown, defendant's obligation under the secrecy agreements was to submit for prepublication review *all* information or material relating to the CIA,

its activities or intelligence activities generally, and not, as the defendant contends, only materials which were classified. Defendant breached this obligation, and the district court found that the breach occurred "willfully, deliberately and surreptitiously." The evidence of record supports these findings and they are not clearly erroneous. The record shows also that defendant has prepared other writings and that he does not intend to submit them for prepublication review because he claims that they do not contain classified information.[6] The testimony of top CIA officials supports the district court's finding that defendant's failure to submit his book for prepublication review has "impaired CIA's ability to gather and protect intelligence relating to the security of the United States . . . ," and thus the government has suffered irreparable harm from defendant's breach and will suffer future irreparable harm if further breaches are not enjoined. These findings collectively support the grant of injunctive relief under our decision in *Marchetti I*.

### B.

■■■ The substantial problem which this case presents is the correctness of the district court's imposing a constructive trust over the revenues from the book for the benefit of the government and ordering an accounting of those revenues. For the reasons which follow, we think that the imposition of a constructive trust was improper and that the government's sole remedy for breach of the contract should be the recovery of compensatory and punitive damages as the proof may support and as a jury may assess.[7]

At the outset we reiterate two factors on which all that follows is based: (1) there is in this case no present claim by the government that any classified material was published, and (2) defendant has a first amendment right to publish anything not classified. The second factor is constant; *Marchetti I* and *Marchetti II*, which we decline to reexamine, settle it. The first factor, however, is simply a lack of a claim on the part of the government; and if, on remand for good cause shown, the government should be allowed to amend its answer to the interrogatory and thereafter to prove that classified material was published, our conclusion with reference to the impropriety of imposing a constructive trust would be different.

To sustain the constructive trust, the government argues that the duty to submit writings for prepublication review was a fiduciary one, the breach of which, to the defendant's benefit, justifies the imposition of a constructive trust. *See United States v. Carter*, 217 U.S. 286, 30 S.Ct. 515, 54 L.Ed. 769 (1910); *Community Counselling Service, Inc. v. Reilly*, 317 F.2d 239 (4 Cir. 1963); Restatement (Second) of Agency § 403 (1958).[8] The defendant argues, however, that the duty to submit writings to prepublication review, while a contractual one, was not a fiduciary one, the breach of

---

**6.** We reject defendant's argument that there is no evidence that he will not abide by his contract if we construe it to require prepublication review of all writings relating to the CIA and not merely those which divulge classified information. Our decisions in *Marchetti I* and *Marchetti II* as to the meaning of the secrecy agreements were well known before defendant undertook to publish his book, and he acted in flagrant violation of them. In any event, the danger to national security arising from an unauthorized publication of classified material is so great that we think that little proof of a probable future violation is required to justify injunctive relief.

**7.** As relief, the complaint prayed, *inter alia,* that "the defendant be required to pay to the plaintiff such damages as plaintiff has sustained as a result of the defendant's breach of contract." There was no specific prayer for punitive damages. On remand, the government may conclude to amend its complaint to pray recovery of punitive damages. Leave to do so shall be "freely given." F.R.Civ.P. 15(a) and (b).

**8.** The government also asserts, somewhat tentatively, that a constructive trust may be imposed where legal remedies are inadequate. In view of our conclusion that the government is entitled to damages, *see* p. 938 *infra*, its remedies at law are not insufficient, and its contention must fail.

which justifies resort only to usual contract remedies of damages and, in an appropriate case, an injunction.

An employment contract can unquestionably create a fiduciary relationship. *See* Restatement (Second) of Agency § 376, Comment a (1958). But not all contractual duties on the part of the employee are fiduciary in nature. *Id.* § 400, Comment c. The 1968 secrecy agreement does not place convenient labels on which, if any, of defendant's duties are fiduciary ones. It is apparently conceded by defendant, and we agree, that both from the language of that contract and the circumstances under which it was made, that contract does create a fiduciary relationship with regard to the duty not to disclose classified material. But we do not think, having regard to the defendant's first amendment right to publish unclassified information, that the contract, even in the light of the circumstances under which it was made, creates any fiduciary relationship to submit writings for prepublication review which do not disclose classified information.[9] At most, with regard to unclassified information, there is only a contractual duty to submit writings to prepublication review, although it is one that, because of the risk to national security of an inadvertent or ill-advised publication of classified information, should be rigorously enforced by injunction and otherwise.

Although we conclude that the government is not entitled to a constructive trust, it is not without remedy. Defendant has clearly breached his contract and the government is entitled to damages for the breach. The district court, of course, found that the government's damages were not quantifiable; but even if the government is unable to prove the dollar value of the injuries to it flowing from the breach, it is entitled to nominal damages. And we think that it is entitled to more.[10]

Ordinarily punitive damages are not recoverable for breach of contract. *See* Restatement of Contracts § 342 (1932); 11 S. Williston, Contracts § 1340 (3d ed. 1968); 5 A. Corbin, Contracts § 1077 (1951). But there are exceptions to the general rule where the acts constituting the breach also constitute the commission of a tort or are closely analogous thereto. *See Williston, supra* at 211–213; *Corbin, supra* at 367.[11] The usual examples are suits for breach of promise, suits against public service companies for breach of some contractual undertaking, and suits by a depositor against a bank for wrongfully failing to honor checks or drafts.[12] While the instant case does not

---

**9.** The government has not cited, nor have we found, any case holding that the duty to seek permission from an employer to disclose confidential information, however important to protect the confidential information, is in and of itself a fiduciary one. Rather, in the usual case, the fiduciary duty is not to disclose the information, the trade secret, or the like, or, as *United States v. Kearns,* 193 U.S.App.D.C. ——, 595 F.2d 729 (1978), not to misuse an official position.

**10.** Because the 1968 secrecy agreement as a general form of contract as well as a specific agreement with defendant was intended to have nationwide as well as international effect, we think that the rights of the parties are to be determined by federal common law and not merely the law of a state having some nexus to its formation. In determining what is federal common law, we look however to general authorities and to state law as a convenient source of reference for fashioning the applicable federal rule. *See Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943).

**11.** The Restatement takes the position that there are no exceptions to the general rule and that any punitive damages in an action for breach of contract are sustainable only by the tort aspects of the action. *See* Restatement of Contracts § 342, Comment c.

**12.** Based upon the law of Virginia, three district court cases in this circuit have recognized that punitive damages may be recovered in contract actions, at least where malice, fraud, or criminal indifference is shown: *Matney v. First Protection Life Ins. Co.,* 73 F.R.D. 696 (W.D. Va. 1977) (suit on health insurance policy for failure to pay claim); *Material Handling Industries, Inc. v. Eaton Corp.,* 391 F.Supp. 977 (E.D. Va. 1975) (suit by retailer against manufacturer for breach of contract and antitrust violation); *National Homes Corp. v. Lester Industries, Inc.,* 336 F.Supp. 644 (W.D. Va. 1972) (recovery of punitive damages for breach of contract not dischargeable by defendant's bankruptcy). *See also Wright v. Everett,* 197 Va. 608, 90 S.E.2d 855 (1956).

fit nicely into any of these categories, we think nonetheless that it, too, should be deemed to constitute an exception to the general rule.

Viewed in the light most favorable to the government, the evidence in the case shows that prior to publication of his book defendant knew of his obligation to submit his manuscript for prepublication review. Not only did he possess this knowledge, but he acknowledged it to his former superiors at the CIA on a number of occasions, at the same time falsely representing to them that he would submit the manuscript for review prior to publication. Manifestly, had defendant's former superiors known that defendant's representations were falsely made, they could have instituted an action to enjoin publication without prior submission, and undoubtedly they would have prevailed. *See Marchetti I.* The evidence shows that the possibility of such an action reached the stage of consultation with the Department of Justice but the idea was abandoned because of defendant's misrepresentations. The government's evidence shows that although not quantifiable, the government suffered damage from publication without prepublication review.

 From the evidence, a trier of the fact could well conclude that defendant's actions, and the government's reliance thereon, amounted to deceit, so that defendant's breach of contract has implications of a tort where punitive damages may be assessed.

> Where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime, all but a few courts have permitted the jury to award in the tort action "punitive" or "exemplary" damages, or what is sometimes called "smart money." Such damages are given to the plaintiff over and above the full compensation for his injuries, for the purpose of punishing the defendant, of teaching him not to do it again, and of deterring others from following his example.

W. Prosser, Law of Torts § 2 at 9 (4th ed. 1971) (footnotes eliminated). Indeed, in its brief the government makes clear that its principal purpose in seeking recovery of monies from defendant is for the purposes both of punishing him and of deterring others. This is more properly the function of an award of punitive damages than of a constructive trust, since a constructive trust depends on the concept of unjust enrichment rather than deterrence and punishment. *See* D. Dobbs, Law of Remedies § 3.9 at 205 and § 4.3 at 246 (1973).

 Further to define the punitive damages that the government may recover, we add these comments: Since the government contends and the district court found that the government's compensatory damages are not quantifiable and we view the function of punitive damages in a case such as this as the dual one of punishing the defendant and deterring others from like misconduct, we think it follows that there is no necessary correlation between the amount of punitive damages that may properly be assessed and the amount of compensatory damages that the government may prove. *See, e. g., Harrison v. United Transportation Union,* 530 F.2d 558, 563 (4 Cir. 1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976); *Bucher v. Krause,* 200 F.2d 576, 587 (7 Cir. 1952), *cert. denied,* 345 U.S. 997, 73 S.Ct. 1141, 97 L.Ed. 1404 (1953); D. Dobbs, *supra,* § 3.09 at 210–11. Of course, in reaching that conclusion, we necessarily align ourselves with those courts which have held that punitive damages may be recovered so long as there is a legal injury to support the award of at least nominal compensatory damages, and we reject the view that punitive damages may not be recovered unless there is proof of substantial compensatory damages. *See Harrison v. United Transportation Union, supra.* In our view, any punitive damages in this case, since their purpose will be both to deter and to punish, should be assessed not only with a view to the defendant's culpability but also with a view to the defendant's financial circumstances both at the time that he committed the breach and when he will have realized all of the fruits

of the breach. D. Dobbs, *supra*, § 3.9 at 218–19.

Of course what we have said about the factual aspects of the government's right to recover punitive damages stems from our viewing the record in the light most favorable to the government and in the light also of the district court's finding that the defendant breached the contract "willfully, deliberately and surreptitiously" for "personal financial gain." Defendant does not concede the correctness of these findings and defendant offered evidence in opposition thereto. Should the government press the claim to punitive damages which we conclude that it possesses, the award and assessment of damages, if other than nominal, must be made by a jury. To that extent, we agree with defendant that he is entitled to a jury trial. But even if the issue of compensatory and punitive damages is tried to a jury, the government is entitled to partial summary judgment on the fact that defendant breached his contract and that he is liable at least for nominal damages.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

WALTER E. HOFFMAN, Senior District Judge, concurring in part and dissenting in part:

While I unhesitatingly agree with the majority that Snepp's actions in breaking the contract were willful, deliberate and surreptitious, and that an injunction against future acts was appropriate, my disagreement lies in the rejection of the constructive trust established by the district court. I would affirm the district court in the entirety.

The majority apparently contends that there was no breach of Snepp's fiduciary duties in publishing nonclassified material, even though the secrecy agreement provided that *all* material would first be submitted to the CIA for approval prior to publication. It is true that, in answer to an interrogatory requesting information as to classified material contained in Snepp's book, the government did state that *for the purposes of this litigation* the government does not contend that any information was classified. The government did *not* affirmatively state that the book did not contain classified material. The majority states that, on remand for good cause shown, the government may amend its answer to the interrogatory and prove that classified material was published. Once this had been done, it is available to the public and the media and the purpose of any classification has been destroyed.[1] If Snepp had followed the dictates of the *Marchetti* cases, the CIA would have been afforded the opportunity of segregating classified from unclassified material. Indeed, the majority states that if the classified material is disclosed on remand, then its conclusion as to the impropriety of imposing a constructive trust would be different. It seems to me that this is too great a penalty to exact where a constructive trust affords a ready solution to the problem and will act as a moderate deterrent, not only to Snepp but also to others similarly inclined.

Contrary to the view of the majority, the 1968 secrecy agreement does, in my judgment, establish a fiduciary relationship in that it requires *all* material to be submitted for review prior to publication. The majority agrees that a fiduciary relationship exists with regard to the duty not to disclose classified material, but expresses the view that this fiduciary relationship does not apply with respect to unclassified material. The 1968 secrecy agreement was no ordinary contract; it gave life to a fiduciary relationship and invested in Snepp the trust of the CIA. When Snepp accepted this trust, the disclosure of this same information from sources and methods available solely to the CIA did not release him from his fiduciary relationship to remain silent—at least until the CIA had an opportunity to

1. In *United States v. Marchetti (Marchetti I)*, 4 Cir., 466 F.2d 1309, 1314, Chief Judge Haynsworth, speaking for the court, said: "This case itself illustrates the point that the executive and judicial branches proceed on a case by case basis, the executive branch being dependent on the judiciary to restrict unwarranted disclosures."

review the material he intended to publish. Even without the secrecy agreement there existed a duty on Snepp not to reveal any confidential information obtained by reason of his employment by the CIA, even after he resigned. *Restatement (Second) of Agency,* §§ 395, 396, pp. 221–227.

The majority cites *Restatement (Second) of Agency,* § 400, comment c, as authority for the fact that not all contractual duties on the part of an employee are fiduciary in nature. I agree, but the very next sentence qualifies that comment by stating that "he [the employee] is not thereby liable for the profits made in such time if he does not use the facilities of the employer or *confidential information,* and does not act in competition with him." Assuredly, Snepp made use of confidential information in this case, whether classified or unclassified.

A constructive trust is defined as a relationship with respect to property subjecting the person by whom the property is held to an equitable duty to convey it to another on the ground that his acquisition or retention of property is wrongful and that he would be unjustly enriched if he were permitted to retain the property. *Restatement (Second) on Trusts,* § 1e, p. 5. Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises. *Restatement of Restitution,* § 160, p. 640. And in some

situations "a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust. In such cases, the defendant may be under a duty to give to the plaintiff the amount by which he has been enriched. Thus where a person with knowledge of the facts wrongfully disposes of the property of another and makes a profit thereby, he is accountable for the profit and not merely for the value of the property of the other with which he wrongfully dealt." *Restatement of Restitution,* § 1e, p. 14.

Snepp's case fits the foregoing statements like a glove. All of the elements are present and it strikes me as improper that a court should literally require a demand for punitive damages, never demanded by the government, in order to accede to Snepp's demand for jury trial. Moreover, any judgment hereafter obtained against Snepp may indeed be worthless and the government's efforts to effect collection would go down the drain. The remedy afforded by the majority will operate as little or no deterrent in future cases.

I am uncertain as to whether the majority has attempted to establish a rule of punitive damages in federal law, or whether the court relies upon Virginia law, the forum in which this case was tried. Footnote 12 suggests that Virginia law applies.[2]

---

2. The Virginia law on punitive damages in contract actions is set forth in *Wright v. Everett,* 197 Va. 608, 90 S.E.2d 855 (1956), in an action by the owners of real estate against a real estate agent to whom the responsibility of renting plaintiffs' home had been imposed. The agent agreed to investigate the credit reference of any prospective tenant and further agreed to transfer all utility bills to the name of the tenant. He did neither. A jury returned a small verdict for compensatory damages and $3,000 punitive damages. The action was brought in tort even though it arose out of privity of contract between the parties. In reversing the award for punitive damages, the Supreme Court of Appeals (now the Supreme Court) said:

The general rule is that exemplary or punitive damages (with certain exceptions not here pertinent) are not allowed for breach of

contract even though the action is *ex delicto* and not *in assumpsit.* (citations omitted)

As a general rule, damages for breach of contracts are limited to the pecuniary loss sustained. According to the overwhelming weight of authority, exemplary damages are not recoverable in actions for breach of contract although there are dicta and intimations in some of the cases to the contrary. The rule does not obtain, however, in those exceptional cases where the breach amounts to an independent wilful tort, in which event exemplary damages may be recovered under proper allegations of malice, wantonness or oppression—as, for example, in actions for breach of marriage contracts. 15 Am.Jur., Damages, sec. 273, pp. 708 and 709.

*Wright v. Everett, supra,* has been applied and cited with approval in opinions by Judges Widener and Merhige, respectively, in *National Homes Corporation v. Lester Industries, Inc.,*

Assuming that state law applies, it would subject the government, in similar cases, to the varying principles of state law applicable to punitive damages. Overlooked is the fact that different state courts limit, or even prevent altogether, any recovery of punitive damages even where a defendant is entirely culpable, as is Snepp in the instant case. As stated in *Dobbs, Remedies,* § 3.9, p. 208, the state rules have varying degrees of support, but all have some including (1) that the plaintiff may not recover punitive damages unless he can also recover compensatory damages; (2) that punitive damages must be commensurate with the amount of compensatory damages; (3) that equity will not entertain claims for punitive damages; (4) that mass disaster litigation against one or a small number of defendants should not yield punitive damages; and (5) that a principal is not vicariously liable for culpable torts of his servants.

During the pretrial proceedings in the present case, the government conceded that it could not prove any dollar damages and that it had no adequate remedy at law.[3] In federal courts located within states which require some recovery of compensatory damages before punitive damages are recoverable, the government would be left with a claim for nominal damages—not exactly an item which will deter former CIA employees and publishers who are anxious to profit commercially on national and international secrets available to the CIA. In fact, I express grave doubts whether the threat of punitive damages, assuming that they are recoverable under state law, will deter former employees who may be secretly or openly protected by the publisher, thereby protecting the former employees from any loss by reason of an adverse judgment.[4]

The majority agrees that, with the exception of the issue of damages, Snepp's case presented no issue of fact for the jury to resolve. See footnote 4 of majority opinion. The complaint alleged that Snepp failed to submit the manuscript for prepublication review pursuant to the 1968 secrecy agreement and sought a declaration that Snepp

336 F.Supp. 644 (W.D.Va.1972), and *Material Handling Industries, Inc. v. Eaton Corp.,* 391 F.Supp. 977 (E.D.Va.1975)—the first case pertaining to the issue as to whether a punitive damage judgment is dischargeable in bankruptcy; the second case involving a motion to strike a prayer for punitive damages as alleged in the complaint. Although *National Homes Corporation* reached the court of appeals on two different occasions, the propriety of an award for punitive damages was not pursued on appeal. *National Homes Corporation* was based upon a contract containing a covenant not to compete in which an injunction was awarded. Neither case considers the right to a jury trial.

While I assume that punitive damages grounded upon contract may be awarded in Virginia in exceptional cases, I do not believe that the government should be required or permitted to forum-shop for the state which applies the Virginia rule.

3. Numerous pretrial hearings were conducted with briefs being submitted as to varying questions. The district judge had directed the call of a jury panel for the trial on June 20, 1978. Fifty-six pages of the transcript are devoted to the arguments of counsel as to whether any issues remained to be submitted to the jury. Appendix, Vol. II, pp. 4–60. The court made it clear that "if there is any issue of monetary damages other than an accounting, I will submit that to the jury." Appendix, Vol. II, p. 23. Snepp's counsel knew that monetary damages could not be established. His sole contention was that no injury flowed from the fact that Snepp's book had been published. Appendix, Vol. II, pp. 25, 26, 31–33, 59, 60. The government responded that no showing of injury was required in this type of case. Appendix, Vol. II, p. 46, 51. Aside from the prayer for relief requesting that "defendant be required to pay to plaintiff such damages as plaintiff has sustained as a result of plaintiff's breach of contract," Joint Appendix, Vol. I, p. 5, it is abundantly clear that the damages sought by plaintiff were for "unjust enrichment." See Joint Appendix, Vol. I, p. 5, par. 21. It is also clear that this type of damage is merely another way of saying that equitable relief is sought on the ground of unjust enrichment. It was not until after hearing this lengthy argument that the court excused the jury. If, on remand, an amended complaint is filed, with the government electing to eliminate its claim for damages quoted above, it seems that, according to the majority opinion, a jury would not be required even on demand by defendant.

4. It is argued that punitive damages have not been shown to have any effect as deterrents. See *Morris, Rough Justice and Some Utopian Ideas,* 24 Ill.L.Rev. 730, 736 (1930).

had breached his contractual and fiduciary duties, for which the government was entitled to (1) damages in an unspecified amount for breach of contract, (2) an injunction against further breaches, (3) an accounting of the past and future revenues from the sale of the book (Snepp had already received $60,000 from the publisher), and (4) the imposition of a constructive trust over all past and future revenues. No claim was made for exemplary or punitive damages. It is true that Snepp demanded a jury trial. Since the majority holds that only the request for damages required a jury trial, the issue is whether, in a purely equitable action where there is no dispute of fact, an isolated claim for damages in an unspecified amount requires a jury to make such finding where the plaintiff tacitly abandons its claim for damages. In the first place, it is not a certainty that punitive damages are prohibited in an equity action, although the traditional rule is otherwise. *Dobbs, Remedies,* § 3.9, p. 211–12. Similarly, a few authorities have held that, by electing to go into equity, plaintiff waives any claim to punitive damages. *Karns v. Allen,* 135 Wis. 48, 115 N.W. 357 (1908).

If the opinion is intended to create a new federal law on punitive damages, I submit that, in the absence of statute, this cannot be done. The "bounty approach" has been applied in securities fraud situations, environmental cases under 33 U.S.C. § 411, antitrust cases involving treble damages under 15 U.S.C. § 15, and perhaps other like actions, but it has not been applied under federal law without the authority of a statute. I cannot believe that the majority intended to create such a federal law on the subject.

Exemplary damages are not a favorite of the law, the power of giving them should be exercised with great caution, and they are properly confined within the narrowest limits. 22 *Am.Jur.2d, Damages,* § 238. In general, there is no cause of action for exemplary damages alone. *Id.* § 241. There appears to be a split of authority as to whether nominal damages will support a claim for punitive damages. *Id.* § 242. While I agree that exemplary damages re-

quire a jury, when demanded, it is settled that if all the facts warranting such damages are admitted or established without reasonable controversy, there is nothing to submit to the jury on that subject *but the amount to be awarded. Id.* § 341. However, in this case the reversal in part will require a retrial of the entire proceeding to determine the extent of willfulness on Snepp's part in order to determine the amount of the punitive damage award.

We return to the fundamental question— was a jury required as demanded by Snepp in this purely equitable action upon which there is no controversy as to facts and liability in the eyes of the majority, bearing in mind that no punitive damages were requested?

If the allegations of the complaint disclose a cause of action which is simply equitable, a jury trial will not be directed merely because the prayer is for judgment for a sum of money. 47 *Am.Jur.2d, Jury,* § 42. While the constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings, *Dairy Queen v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), and courts are not bound by the pleadings or form of action, the determination of the essential character of the suit or remedy must be made by an examination of the entire pleadings and all issues. 47 *Am.Jur.2d,* § 38. It is the real, meritorious controversy between the parties as shown by the whole case which is controlling. *Id.* § 38. In the present case the district court conducted several pretrial conferences and fully explored the pleadings and all issues prior to excusing the prospective jury panel. This action was not taken until the court was advised that no factual dispute existed.

Since the majority has properly held that there are no legal claims available which justify a jury trial except as to damages, I do not believe that *Dairy Queen v. Wood, supra,* and *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), are applicable. In the latter case, filed as a declaratory judgment action,

a counterclaim alleging treble damages for violation of the antitrust laws was filed by the defendant with a demand for jury trial. The district court scheduled the trial of the equitable claim in advance of the law action. Since the equitable interests asserted by plaintiff and the legal issues alleged by defendant were interlocked, the Supreme Court held that a jury trial was mandated. *Dairy Queen v. Wood* deals more specifically with the problem where the district court granted plaintiff's motion to strike the demand for jury trial where plaintiff and defendant had a contract with respect to the use of the trademark "Dairy Queen." Payments were not made by defendant in accordance with the terms of the contract and plaintiff cancelled. Thereafter, defendant continued to use the trademark and plaintiff sued alleging, *inter alia,* a default with an indebtedness in excess of $60,000. The complaint asked for an injunction, an accounting to determine the amount of money owing and a *judgment for that amount,* and an injunction pending accounting to prevent defendant from collecting any money from "Dairy Queen" stores. Defendant denied any breach of contract because of a subsequent oral agreement, laches and estoppel, and denied any violations of antitrust laws. Defendant demanded a jury trial. There is language in *Dairy Queen* indicating that, where a money judgment is demanded, it presents a legal claim. However, in Snepp's case, while a claim for damages in an unspecified amount was contained within the complaint, it was later conceded by the government that it could not prove dollar damages and, in substance and fact, the claim for damages was abandoned. Manifestly, the only remedy available to the government was the establishment of a constructive trust and an injunction. I cannot believe that the right to nominal damages constitutes an adequate remedy at law; nor do I believe that a court may force a plaintiff to seek punitive damages under the guise of saying that this is an adequate remedy at law.

Since this case, as finally presented after an exhaustive discussion of the various issues, was purely an equitable action, it seems proper to invoke the "clean-up" doctrine as discussed in *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966), which permitted, in a bankruptcy proceeding, a judgment for the surrender of a preference in the face of timely jury demand, as being within the traditional equity powers to afford complete relief even though there may exist legal remedies.

Finally, what bothers me appreciably is the effect upon the proper administration of justice. In future cases, if the majority opinion is accepted, district courts, wherever there is a demand for jury trial in an equitable action, will be required to empanel a jury because of the possibility that it may be appropriate to award punitive damages even though plaintiff makes no demand for same. Although the majority does not specifically so state, it apparently stands for the proposition that the government has an adequate remedy at law, either through nominal damages or punitive damages, or both. The remedy at law which will defeat equitable jurisdiction of federal courts must be a remedy at common law. 47 *Am.Jur.2d,* § 41. Clearly, in my opinion, there was no remedy at common law available to the government in Snepp's case.

I join the majority in concluding that, in light of the two *Marchetti* cases, the First Amendment claim is patently frivolous.

With all due respect, I must dissent in part.